579 A.2d 1241

JAMES JOSEPH RYAN, PLAINTIFF–RESPONDENT, v. KDI SYLVAN POOLS, INC., DEFENDANT–APPELLANT, AND FRANK WISEKAL AND NORMA WISEKAL, DEFENDANTS.

Argued October 25, 1988—Decided October 3, 1990.

*Joseph T. Stearns* argued the cause for defendant-appellant (*Leonard, Kenny & Stearns,* attorneys).

*Robert F. Wood,* a member of the New York bar, argued the cause for plaintiff-respondent (*David Spector,* attorney).

PER CURIAM.

Plaintiff, James Ryan, seeks damages for personal injuries resulting from a dive into a swimming pool on residential premises. The pool was manufactured by defendant KDI Sylvan Pools, Inc. (KDI), and was located on property owned and occupied by defendants Wisekal. Plaintiff's products-liability case against KDI was based on design defect and lack of adequate warning. The claim against the property owners sounded in negligence.

The property owners settled with plaintiff shortly after the trial commenced. The case proceeded against KDI, and the jury returned a verdict in favor of plaintiff. The verdict

apportioned the fault among plaintiff, the Wisekals, and KDI. Thereafter, the trial court molded the verdict to reflect the jury's apportionment. On appeal KDI attacked that apportionment as well as the trial court's ruling on the admissibility of KDI's expert testimony and the amount of the verdict. In an unreported opinion, the Appellate Division affirmed. We granted certification, 111 *N.J.* 575, 546 *A.*2d 502 (1988), and now reverse and remand for a new trial on KDI's liability.

I

On June 10, 1984, plaintiff, a social guest at the Wisekals' home, was swimming in their built-in pool, which was equipped with a diving board. On his second dive into the pool, Ryan hit his head on the bottom, sustaining serious injuries for which he sought damages from the pool manufacturer and the homeowners.

Immediately after the opening statements at trial, Ryan settled with the homeowners for $100,000. The trial court instructed the jury that although the Wisekals were no longer in the case, the jury would nevertheless have to resolve the issue of the Wisekals' fault as well as the products-liability claim against KDI. The court also included the "ultimate outcome" instruction suggested by *Roman v. Mitchell*, 82 *N.J.* 336, 413 *A.*2d 322 (1980), which informs the jurors of the effect of their findings on the ultimate result.

During trial the court dismissed KDI's defense that plaintiff had voluntarily and unreasonably encountered a known danger when he dove into the pool. See *Cartel Capital Corp. v. Fireco*, 81 *N.J.* 548, 563, 410 *A.*2d 674 (1980); *Suter v. San Angelo Foundry and Mach. Co.*, 81 *N.J.* 150, 164, 406 *A.*2d 140 (1979); *Restatement (Second) of Torts* § 402A Comment n (1977). Consistent with that ruling, not challenged on this appeal, the court charged the jury that plaintiff's negligence, if any, should be considered only in relation to the negligence of the Wisekals, the settling defendants. It further instructed the

jury that plaintiff's negligence was irrelevant to the percentage of fault attributable to KDI, the products-liability defendant.

By answer to special interrogatories the jury indicated that it found a products-liability cause of action against KDI and a negligence cause of action against the Wisekals. It further found that plaintiff, "in relation to the Wisekals," had been partially at fault for the accident. Again in answers to special interrogatories, the jury indicated that it found KDI fifty percent at fault, the Wisekals thirty-five percent, and plaintiff fifteen percent.

In response to another special interrogatory the jury found the total damages to be $550,000. On the basis of *Cartel Capital Corp. v. Fireco, supra,* 81 *N.J.* 548, 410 *A.*2d 674, the court interpreted the jury's allocation of fault to require KDI to pay fifty eighty-fifths of the judgment, or $325,529.

Thereafter the court revised its molding of the verdict. Relying on the proposition that "[a] non-settling tortfeasor against whom a verdict is entered is entitled to an offset equal to the amount of the settling tortfeasor's proportionate share of fault," the court decided that KDI should pay sixty-five percent of the judgment, citing *Cartel, supra,* 81 *N.J.* 548, 410 *A.*2d 674; *Rogers v. Spady,* 147 *N.J.Super.* 274, 371 *A.*2d 285 (App. Div.1977); and *Dimogerondakis v. Dimogerondakis,* 197 *N.J. Super.* 518, 485 *A.*2d 338 (Law Div.1984). Thus, KDI was held responsible for $550,000 minus thirty-five percent ($192,500), or $357,500.

The Appellate Division affirmed the trial court judgment in all respects.

## II

KDI argues that the trial court erred in excluding proffered testimony of its expert and that, contrary to the Appellate Division's holding, the error was not harmless. It also contends that the trial court molded the jury verdict improperly. Finally, it attacks the amount of award as excessive.

—A—

Plaintiff claims that the pool was defectively designed because it was equipped with a diving board that, given the configuration and depth of the pool, was unsafe to use. He contends that the pool should have had depth markers or at least warnings that diving, or certain types of diving, might be unsafe. Eugene Drury, plaintiff's expert, testified that pool-depth standards of the swimming-pool industry's trade association (NSPI), adopted in 1974, were totally inadequate to insure safe diving.

KDI claims that the pool was not defectively designed and that the warnings included in the owner's handbook were sufficient. Defendant offered the testimony of Joseph Schmerler, an acknowledged expert in the promulgation and revision of NSPI standards. His testimony established that KDI had constructed the Wisekals' pool to meet those standards.

In Schmerler's opinion there is no need for warnings in residential swimming pools. When asked the basis of that opinion, Schmerler testified that he had relied on information available in

> Dr. Gabrielson's reports from the Phoenix Spinal Cord Injury Center that has accumulated data over a period of time and the New England Spinal Cord Injury Center, various other investigators in California and other locations, even outside the country, and assimilated that information and came to a conclusion as to the number of, of reasonable range of number of spinal cord injuries that take place on an annual basis in swimming pools.

Concerned about the direction of the expert's testimony, the trial court conducted an *Evidence Rule* 8 hearing out of the jury's presence. Schmerler then testified that "[t]here are probably within sixty and a hundred injuries in residential swimming pools on an annual basis," and that there have been about four to six cervical spine injuries of the type sustained by Ryan over a seventeen-year period in pools with diving boards meeting NSPI 1974 standards.

On cross-examination Schmerler said that he had obtained his information by interviewing some people who had been injured,

but had not reviewed public court dockets. He further testified, "I made an analysis of data that [were] available and I went through and picked out the cervical spine injuries from diving boards, yes, as well as interviews with diving board manufacturers and fabricators of vinyl liner swimming pools in the mass market." When questioned about the reliability of the information, Schmerler acknowledged that he did not know how to verify it, and agreed that manufacturers might have a vested interest in underreporting the number of injuries.

Defendant's expert stated that the data on which he had relied were the same as those on which the pool-standard promulgators rely. The witness added that it was reasonable to rely on those types of data and that the Consumer Product Safety Commission relies on them. Schmerler serves on the Data Collection Subcommittee and the Technical Subcommittee of the Consumer Product Safety Commission. The Data Collection Committee collects information on swimming-pool accidents and decides whether it should be circulated to other subcommittees.

The trial court ruled that it would "not permit [Schmerler] to advise the jury as to the number of incidents wherein a diving injury occurred based on his status." The court was unsure about what exactly had been studied:

> [T]he bottom line is that you get an expert that comes in and says, "I looked at a lot of materials and I spoke to a lot of people * * *." It's all relatively vague and I think puts the plaintiff in a very unfair position, particularly in light of the substantive rule of law, that lack of presence of prior injuries is not supposed to come into evidence at all, on the question of whether the product was safe or not.

The trial court did, however, permit Schmerler to express his opinion that no warnings were needed.

Relying on *Bowen v. Bowen*, 96 *N.J.* 36, 49–50, 473 *A.*2d 73 (1984) ("the sources of an expert's testimony must be relevant as well as reliable"), and *State v. Cavallo*, 88 *N.J.* 508, 516, 443 *A.*2d 1020 (1982) ("under [former] *Rule* 56(2)(b), expert testimony is admissible only if the expert has sufficient expertise to offer the intended testimony and the testimony itself is suffi-

ciently reliable"), the Appellate Division held that the trial court had properly excluded the evidence under *Evidence Rule* 56(2) because the data were too unreliable and too vague. It also decided that if the exclusion was error, it was harmless.

KDI claims that Schmerler's testimony regarding the number of diving accidents that had occurred over the past seventeen years should have been admitted under the amended version of *Evidence Rule* 56(2), effective July 1, 1982. That *Rule* now reads:

(2) A witness qualified pursuant to *Rule* 19 as an expert by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. *If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the fact or data need not be admissible in evidence.* (Emphasis added.)

Comment 7 to the *Rule* explains that

[a]ccording to the Evidence Subcommittee, the amendment makes clear that an expert opinion may be based on facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject.

KDI argues that under the new version of *Evidence Rule* 56(2), "a party calling a qualified expert is entitled to hear that witness' opinion and the basis for it, subject only to the requirement that the facts or data be of a type such experts reasonably rely on." It also contends that the witness' basis must be deemed reliable because the court charged the jury that a manufacturer's duty to warn is triggered by reliable information "such as may come from * * * experts in the field." Hence, KDI argues, "dispute as to the conceded expert's data's 'reliability' is foreclosed by virtue of the court's charge, if only *he* says *his* reliance *is* reasonable."

To be helpful to the trier of fact, expert testimony must be sufficiently reliable. *State v. Kelly*, 97 *N.J.* 178, 209, 478 *A.*2d

364 (1984). According to the Joint Subcommittee on Evidence of the Supreme Court Civil and Criminal Practice Committees, the new language of *Evidence Rule* 56(2) was adopted to "allow more latitude in the admission of expert opinion testimony" while honoring the "spirit" of the former *Rule.* *Evid.R.* 56, comment 7. Several cases decided under the pre-July 1, 1982, version of *Evidence Rule* 56(2) shed light on the spirit of that *Rule.*

That version read as follows:

If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (a) based primarily on facts, data or other expert opinion established by evidence at the trial and (b) within the scope of the special knowledge, skill, experience or training possessed by the witness.

The Appellate Division noted that this Court has interpreted that language to require that expert testimony be sufficiently reliable, citing *Bowen v. Bowen,* 96 *N.J.* 36, 49–50, 473 *A.*2d 73 (1984), and *State v. Cavallo,* 88 *N.J.* 508, 516, 443 *A.*2d 1020 (1982).

In *Bowen,* we held that an accountant's valuation, for equitable-distribution purposes, of stock in a closely-held corporation was entitled to little weight when the accountant could offer no basis in generally-accepted accounting principles other than his own experience. 96 *N.J.* at 49, 53, 473 *A.*2d 73. We concluded that the accountant's testimony was admissible even though it had an unreliable foundation, the unreliability affecting only the weight.

Under *Bowen,* therefore, unreliable methods of forming an opinion affect the weight of expert testimony but not its admissibility. 96 *N.J.* at 49, 473 *A.*2d 73. *Bowen* supports arguments for the admissibility of Schmerler's testimony including the basis for his opinion. After considering the sources of his calculations, the jury could decide the appropriate weight to accord that testimony. Thus, the jury would hear the pool manufacturer's possible motive to underreport the number of accidents and could weigh Schmerler's opinion accordingly.

In *Cavallo,* the defendants had sought to introduce expert psychiatric testimony that they did not exhibit the characteristics common to all or most rapists. 88 *N.J.* at 518, 443 *A.*2d 1020. After noting that the requirement of reliability derives from the common law of evidence and has survived the adoption of the *Evidence Rules,* this Court upheld the exclusion of the expert evidence because the defendants had failed to show that the scientific community accepts the ability of psychiatrists to discern whether one is likely to be a rapist. *Id.* at 517 n. 2, 519, 443 *A.*2d 1020.

*Cavallo,* however, is distinguishable from this case. There the issue was the reliability of the testimony itself—whether anyone can determine with two examinations that a person has the distinctive psychological traits of a rapist. This Court held that that testimony was not admissible absent proof that such evidence is generally accepted by the scientific community. In the present case the question is the admissibility of an acknowledged expert's testimony based on potentially-unreliable data despite testimony that experts in the field rely on those types of data. *Cavallo* focuses on the danger that when unreliable testimony is labeled "expert," juries might not accurately assess its weight.

Although it does not answer the specific question addressed on this appeal, this Court's analysis in *State v. Kelly, supra,* 97 *N.J.* 178, 478 *A.*2d 364, provides valuable guidance. In *Kelly* we examined whether testimony about the battered-woman's syndrome satisfied the limitations on expert testimony imposed by the new version of *Evidence Rule* 56(2) and applicable case law. The Court explained that with regard to testimony involving scientific evidence,

> *Evidence Rule* 56(2) provides that an expert may testify "as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue." In effect, this *Rule* imposes three basic requirements for the admission of expert testimony: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the fields testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable;

and (3) the witness must have sufficient expertise to offer the intended testimony. See *N.J. Rules of Evidence* (Anno.1984), Comment 5 to *Evid.R.* 56. [97 *N.J.* at 208, 478 *A.*2d 364.]

To meet the second requirement, that the testimony be sufficiently reliable, counsel must establish that the testimony "satisfies New Jersey's standard of acceptability for scientific evidence." *Id.* at 209–10, 478 *A.*2d 364. "The technique or mode of analysis used by the expert must have a sufficient scientific basis to produce uniform and reasonably reliable results so as to contribute materially to the ascertainment of the truth." *Id.* at 210, 478 *A.*2d 364.

The Court explained that in a new field of research, such as the battered-woman's syndrome, there are three ways to prove the general acceptance of scientific evidence and thereby its reliability: "(1) by expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis; (2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; and (3) by judicial opinions that indicate the expert's premises have gained general acceptance." *Ibid.* We pointed out that the theory of the battered-woman's syndrome had developed in a growing area of study and that it was gaining scientific recognition. Although concluding that the scientific basis of the evidence was sufficiently reliable, the Court refrained from conclusively ruling that the expert's testimony would satisfy New Jersey's standard for the admission of scientific evidence because the State had not been given a "full opportunity in the trial to question [the defense expert's] methodology in studying battered women or her implicit assertion that the battered-woman's syndrome has been accepted by the relevant scientific community." 97 *N.J.* at 211, 478 *A.*2d 364. The opinion suggests that the Court was not satisfied that the testimony had established that experts in the field accepted such a theory. *Cf. Windmere, Inc. v. International Ins. Co.*, 105 *N.J.* 373, 522 *A.*2d 405 (1987) (insufficient demonstration of

professional community's general acceptance of voiceprint analysis to mandate admissibility of voiceprint).

The question that remains is: how can a court determine whether data reasonably relied on by experts in the field are sufficiently reliable? Put differently, who should decide that reliance by experts is reasonable, and therefore reliable, once it has been established that the experts in fact do rely on certain information?

*Evidence Rule* 56(2) mirrors the language of *Federal Rule of Evidence* 703. "The *Rule* was intended, as described in the Notes of the Advisory Committee on Proposed Rules, to 'bring the judicial practice into line with the practice of the experts themselves when not in court.'" *Soden v. Freightliner Corp.,* 714 *F.*2d 498, 512 (5th Cir.1983). "The indicia of reliability under *Rule* 703 is the fact that experts in the field in question rely on this type of data." *In re Japanese Elec. Prods.,* 723 *F.*2d 238, 277 (3d Cir.1983).

The federal *Rule* requires two inquiries: "(1) do experts in the field in fact rely upon this kind of facts or data? and (2) if so, is their reliance reasonable?" *McCormick, Evidence,* § 15, Pocket Part at 3 (E. Cleary 3d ed. 1987) (hereinafter *"McCormick "*). The commentators further observe that the division of responsibility in respect of the two inquiries remains a question. Regarding the first inquiry, they suggest that the primary source of information should be testimony by the experts themselves, literature in the field, and perhaps judicial notice, all presented to the court for its determination. Without such testimony, a court is ill-equipped to make the determination, and to do so would contravene the *Rule.* For the expert alone to make the determination would be "atypical and inconsistent with the [*Rule* ] * * * directing the judge generally to pass upon the qualifications of witnesses and the admissibility of evidence." *McCormick, supra,* at § 15. As to the second inquiry, to allow experts themselves to pass on the reasonableness of their own reliance would be atypical and inconsistent

with the court's role. The court must make the finding on what the expert's practice is and whether it is reasonable. *Ibid.* Finally, regarding the reasonableness of the reliance, a "presumption of reasonableness would be consistent with the basis, purpose, and language of *Rule* 703 [our *Evidence Rule* 56(2) ]." *Ibid.*

The writers note, however, that under *In re Japanese Electronic Products, supra,* 723 *F.*2d at 277, the allocation of responsibility is not so clear-cut. *Ibid.* In that case the Third Circuit upset the district court's decision to exclude certain expert testimony that it had considered unreliable. In deciding whether the data referred to were relied on by experts in the field, the district court had stated: "We do not consider the affidavits submitted by plaintiff's experts to the effect that the material upon which they relied in forming their opinions is of a type generally relied upon by experts in their respective fields as in any way determinative of the issue." 723 *F.*2d at 276. The trial court had disregarded the affidavits and had formulated its own set of standards. *Ibid.* The circuit court held that "[t]he court's approach involved fundamental legal error because, as a matter of law, the district court must make a factual inquiry and finding as to what data experts in the field find reliable. There is no discretion to forebear from making this inquiry and this finding." *Id.* at 277. Rigorous cross-examination of the expert is appropriate, with the weight to be accorded the evidence being left to the determination of the fact-finder. *Id.* at 277–78.

Federal courts have interpreted the *Rule* differently, with some, as in *In re Japanese Electronic Products,* holding that once a court determines that experts in a field reasonably rely on certain data, the court should not substitute its own judgment for that of the experts. Others have evaluated the reliability of the evidence. See *Soden v. Freightliner Corp., supra,* 714 *F.*2d at 504–05 ("Though the courts have afforded experts a wide latitude in picking and choosing the sources on

which to base opinions, *Rule* 703 nonetheless requires courts to examine the reliability of those sources.").

■ We interpret *Evidence Rule* 56(2) to require that a court make an inquiry into and a finding on whether experts in the given field rely on certain information. If such reliance be found, then it is presumed to be reasonable. That interpretation of the *Rule* strikes a fair balance between the intent of the amended language and the "spirit" of the prior *Rule*, which has been interpreted to require the court to make a determination on the reliability of the testimony. The amendment was made explicitly to expand the data on which an expert can rely in forming an opinion. The focus should be on what the experts in fact rely on, not on whether the court thinks they should so rely. Requiring the trial court to make a finding on whether experts in the field actually rely on certain information satisfies the intent of the new language. Allowing the court to overrule that presumption of reliability will result in the exclusion of evidence only under unusual or extreme circumstances, thus satisfying the "spirit" of the former *Rule*.

■ Applying that conclusion to the facts of this case requires us to reverse and remand for a new trial because the trial court did not make the requisite finding. The court's attempt to clarify the source of Schmerler's information was not successful, as evidenced by its own comment that it "all seem[s] pretty vague." The court abandoned further inquiry into whether experts rely, and reasonably rely, on the information, because it thought the evidence should be excluded on other grounds.

Nor can we accept the Appellate Division's conclusion that the wrongful exclusion of the evidence was harmless error. It is true that the witness was permitted to express his opinion that warnings were not needed; but the basis for that opinion— only four to six cervical spine injuries of the type sustained by Ryan over a seventeen-year period in pools with diving boards

meeting NSPI 1974 standards—might carry considerable weight with the jury.

██ There remains the question, not addressed by the Appellate Division, of whether the trial court was correct in holding that the exclusion of evidence of prior accidents in negligence cases "to show the dangerousness (or safety) of the particular condition," see *Muscato v. St. Mary's Catholic Church*, 109 *N.J.Super.* 508, 510, 264 *A.*2d 74 (App.Div.1970), applies in design-defect failure-to-warn cases. KDI argues that when confronted with a claim of design defect, under a risk-utility analysis a defendant must be able to introduce evidence of prior similar accidents to establish what the risk was and thus demonstrate that the utility outweighed the risk. Here the core of defendant's liability rested on the product's potential or propensity for harm. The jury was asked to evaluate the likelihood of such harm without the benefit of evidence of spinal-cord injuries from conforming pools and diving boards. KDI claims that it was deprived of the opportunity to show the jury that there has been only an infinitesimal number of serious accidents in pools with diving boards that conform to industry standards.

Evidence of prior similar accidents is relevant and should be admissible as evidence of the risk, or lack thereof, of a product. We have found several factors relevant in a risk-utility analysis, among them "[t]he safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury." *O'Brien v. Muskin*, 94 *N.J.* 169, 182, 463 *A.*2d 298 (1983). Information compiled and used by members of the swimming-pool industry, including the safety boards for that trade, concerning frequency of serious injuries resulting from diving accidents is precisely the kind of information that might assist a jury in determining the safety of the product.

We therefore hold that exclusion of defendant's expert's testimony amounted to reversible error.

—B—

We now turn to the knotty problem of molding a verdict.

To recapitulate, the jury determined that plaintiff's damages amount to $550,000, and it apportioned the fault as follows: fifteen percent against plaintiff, thirty-five percent against the Wisekals, and fifty percent against KDI. The court molded the verdict so that KDI was assessed sixty-five percent of the damages, reflecting the total minus thirty-five percent—the share attributed to the Wisekals, the settling defendants. It reasoned: "The Wisekals' proportionate share of fault is equal to their comparative fault determined by the jury, since the Wisekals were negligent rather than strictly liable, and thus entitled to a comparison which includes the plaintiff's negligence. Therefore, [KDI's] responsible share equals $550,000 [minus] 35%, or $357,500."

At first glance the trial court's solution seems compatible with the cases on which it relied, namely, *Cartel Capital Corp. v. Fireco, supra,* 81 *N.J.* 548, 410 *A.*2d 674; *Rogers v. Spady, supra,* 147 *N.J.Super.* 274, 371 *A.*2d 285; and *Dimogerondakis v. Dimogerondakis, supra,* 197 *N.J.Super.* 518, 485 *A.*2d 338. None of those cases, however, contained a critical feature of this one: a comparatively-negligent plaintiff. Therefore giving to the non-settling tortfeasor in those cases a credit for the amount of fault that the jury attributed to the settling tortfeasors left undisturbed the amount of fault that the jury found in respect of the non-settling defendant. Whether the formula for molding the verdict was stated in terms of (a) giving the non-settling tortfeasor a credit for the settling tortfeasor's fault or (b) holding the non-settling tortfeasor liable only for so much of the total damage as the jurors had ascribed to its fault, the non-settling defendant's percentage of the total verdict for which it was liable would remain the same. But in the case at hand, with the added feature of a comparatively-negligent plaintiff, the result varies depending on how the verdict-molding formula is stated. If it is articulated in the

trial court's terms, the non-settling tortfeasor, KDI, is responsible for sixty-five percent of the damages; if stated in KDI's terms, the non-settling tortfeasor should be responsible only for the portion of fault that the jury attributed to it, namely, fifty percent.

Neither of the foregoing results is satisfactory, because neither makes an *equitable* assignment of liability (or apportionment of damages) based on the jury's determination of the respective percentages of fault when plaintiff's contributory negligence is legally significant in respect of one defendant (the "negligence" defendant) but not the other (the "strict-liability" defendant). To hold, as the trial court did in this case, that the non-settling tortfeasor receives credit only for the proportionate share of the settling tortfeasor skirts the issue of fairness when, as here, the non-settling tortfeasor's share turns out to be greater than its share of fault as determined by the jury (sixty-five percent as against fifty percent). In effect, the strict-liability defendant assumes *all* of the fault that the jury determined was plaintiff's. On the other hand, the law prohibits a strict-liability defendant from benefitting from any contributory fault of a plaintiff; therefore, if KDI is assessed only fifty percent of the damages, it gains an unlawful advantage from plaintiff's conduct.

Resolution of the apparent dilemma lies in recognizing that although liability is based on fault, the two are not synonomous or interchangeable. Courts determine liability not only on the basis of a fact-finder's assignment of fault but also by application of rules of law. Fault focuses on the actual causes of an event. Here, the jury determined that plaintiff was fifteen percent at fault; yet we know that a rule of law can provide that even though a plaintiff is at fault, that circumstance will affect neither the right to recover nor the amount of damages that may be awarded. Indeed, that is precisely what our law says in respect of a plaintiff's ordinary negligence in a claim against a strict-liability defendant. *E.g., Cartel Capital Corp. v. Fireco, supra,* 81 *N.J.* at 563, 410 *A.*2d 674. Conversely, a

rule of law can provide that a plaintiff's fault will affect the right of recovery and will limit the amount of recovery—precisely what our Comparative Negligence Act does. See *N.J. S.A.* 2A:15–5.1, –5.2.

■ In order to translate fault as determined by the jury into liability in this case, we must develop a formula to mold the verdict that will accommodate established rules governing the effect of plaintiff's contributory fault on the amount of liability of each defendant. We conclude that plaintiff's fault is best dealt with by (1) apportioning his fifteen-percent fault between the two defendants based on their relative fault as the jury determined, then (2) increasing the damages for which the strict-liability defendant, KDI, is responsible by the assigned amount, while (3) leaving undisturbed the amount for which the "negligence" defendants are responsible.

The above-stated approach answers KDI's complaint that under the trial court's method, and assuming that neither a "negligence" defendant nor a strict-liability defendant settles, a plaintiff will always be entitled to recover 100 percent of the verdict no matter how much at fault the plaintiff may have been, up to the limits imposed by the Comparative Negligence Act. Our ruling effectively reduces a plaintiff's award based on the relative degree of fault the jury has assigned each defendant.

In a case such as this the jury should be instructed to apportion fault among the plaintiff and the two defendants, with the percentage totalling 100, in accordance with the Comparative Negligence Act. See *N.J.S.A.* 2A:15–5.2b. To mold the jury's verdict, the trial court would begin by determining the distribution of plaintiff's fault—here fifteen percent—between the two classes of defendants. That distribution is based on each defendant's proportionate share of fault as determined by the jury; expressing it in percentages facilitates the court's task in applying the rule of law governing plaintiff's contributory fault and strict liability.

To divide a plaintiff's proportionate share of fault between two classes of defendants, the court must determine each defendant's proportionate share of the plaintiff's fault, now assuming that defendants' total shares equal 100 percent. For example, and using the allocations of fault that the jury found in this case (fifteen percent plaintiff, thirty-five percent "negligence" defendants, fifty percent strict-liability defendant):

KDI's share is 50% or $^{50}/_{85}$ths, which amounts to 58.8%. The "negligence" defendants' share is 35%, or $^{35}/_{85}$ths, which amounts to 41.2%.

The court then must factor in plaintiff's fifteen-percent fault:

KDI's proportionate share of plaintiff's fault is 58.8% of 15%, or 8.8%. The "negligence" defendants' proportionate share of plaintiff's fault is 41.2% of 15%, or 6.2%.

The next step is to add to KDI's share of fault as determined by the jury its assigned proportionate share of plaintiff's fault, as follows:

KDI—50% + 8.8% = 59% (rounded up).

Application of the stated formula corrects the inappropriate reduction of KDI's share of liability that would otherwise result from the jury's apportionment of fault to the plaintiff. No adjustment of the "negligence" defendants' share of liability is necessary because the jury's apportionment of fault effectively reduces the "negligence" defendants' share by the appropriate amount. KDI pays fifty-nine percent of the damages. The "negligence" defendants would be responsible for thirty-five percent of the damages. Hence, had there been no settlement, plaintiff would be entitled to ninety-four percent of the damages as determined by the jury: KDI's fifty-nine percent plus the "negligence" defendants' thirty-five percent. The remaining six percent is borne by the plaintiff as a result of his negligence.

We recognize that the fifty-nine percent fault attributed to KDI equals fifty eighty-fifths of the total damages found by the jury. Therefore, a shorthand way of allocating to KDI a portion of plaintiff's share of fault is simply to state that KDI is responsible for so much of the total judgment as equals its

proportionate share of the fault allocated by the jury to all defendants. That share of the judgment, expressed by the fraction fifty eighty-fifths, or 58.8%, necessarily encompasses KDI's proportionate share of plaintiff's fault, calculated in accordance with the forgoing formula. Indeed, that was the basis of the trial court's original approach, which it took on the basis of *Cartel, supra,* 81 *N.J.* 548, 410 *A.*2d 674, but later rejected. We have expressed the formula as we have, however, rather than in terms consistent with *Cartel,* because of the basic and significant difference in the factual complex of the cases.

In *Cartel* the jury apportioned fault among the plaintiff and two strict-liability defendants forty-one percent, twenty-nine percent, and thirty percent respectively. This Court determined that the plaintiff's alleged contributory negligence was immaterial as a matter of law, and that plaintiff was entitled to 100% of the damages. In accordance with that conclusion, the Court molded the verdict by apportioning the plaintiff's fault between the two defendants based on their relative degrees of fault, determining that one strict-liability defendant was liable for twenty-nine fifty-ninths (49.2%) and that the other strict-liability defendant was liable for thirty fifty-ninths (50.8%), totalling fifty-nine fifty-ninths (100%).

As indicated earlier, in the present case only the strict-liability defendant's share of fault should be recalculated to include a percentage of plaintiff's share of fault. The "negligence" defendants' share of fault need not be recalculated. Because the molding will alter only one defendant's share of fault as determined by the jury, the basis for disregarding plaintiff's fault does not exist here as it did in *Cartel.* We therefore have expressed the formula in terms that permit its application to defendants who must be treated differently.

Although in this case the "negligence" defendants had settled with plaintiff, the approach announced today can be applied to determine the share of liability for both a strict-liability

defendant and a "negligence" defendant in situations in which neither one has settled. In making that determination, one cannot completely eliminate the plaintiff's share of fault, as this Court did in *Cartel*, by expressing the shares in terms of eighty-fifths. Instead, the court should apportion the plaintiff's share of fault between the two defendants as described earlier, and add that assigned percentage of the plaintiff's share to the strict-liability defendant's share of fault.

If the retrial on KDI's liability results in a plaintiff's verdict, the court will mold the verdict in accordance with the formula set forth in this opinion.

—C—

■ Finally, KDI challenges the $550,000 award as excessive. The Appellate Division rejected that contention.

Immediately after striking his head on the bottom of the pool, Ryan was unable to move his hands, arms, or legs. He remained on the bottom of the pool until a companion brought him to the surface. After placing plaintiff in a neck brace and immobilizing him on a backboard, medical personnel transported him to Valley Hospital, Ridgewood. Four days later his physicians applied a halo vest, secured by four screws inserted into the patient's head. Plaintiff remained in the halo vest for three months, during which time the screws caused periodic infection. Ryan bears permanent scars from the implanted screws.

Shortly thereafter Valley Hospital transferred Ryan to the Kessler Institute for Rehabilitation in West Orange. After being discharged on September 6, 1984, plaintiff continued treatment on an outpatient basis. Although he returned to work in December 1984, plaintiff complained that he still lacked sensation in his hands, suffered from headaches, and felt fatigued and depressed. At the time of trial, some three years after the event, plaintiff testified that he still suffered from numbness and spasticity in his hands, body spasms, urinary

frequency and urgency, and sexual dysfunction that manifested itself in orgasmic impotence. His treating physicians testified that those physical disabilities were permanent. The treating urologist said that Ryan will require treatment at least twice a year to monitor the urinary dyssynergia, and that damage would result to the kidneys if treatment were not continued. In addition, the urologist believed that there was a fifty-percent chance of the need for surgery within five to ten years of the accident. At the time of trial plaintiff's life expectancy was 32.26 years.

As the Appellate Division observed, the $550,000 verdict, $40,000 of which represented medical expenses, was "substantial" but not " 'so disproportionate to the injury and resulting disability shown as to shock [the] conscience * * *.' " (quoting *Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 596, 379 *A.*2d 225 (1977)). We agree.

On remand, the issue of damages need not be retried. The jury's calculation was independent of its consideration of the liability question and was not tainted by any prejudicial error affecting that issue.

## III

Judgment reversed. The cause is remanded for retrial on the issue of defendant KDI's liability in accordance with this opinion.

*For Reversal and Remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*For Affirmance*—NONE.