**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3909-14T1

CARL LAWSON and
GLORIA LAWSON,
Husband and Wife,

    Plaintiffs-Appellants,

v.

K2 SPORTS U.S.A., K2
BIKE, and NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL
PROTECTION, DIVISION OF PARKS
AND FORESTRY,

    Defendants,

and

BELL SPORTS U.S.A.,

    Defendant-Respondent.

_____

Argued November 15, 2016 — Decided July 24, 2017

Before Judges Espinosa, Suter and Guadagno.

On appeal from Superior Court of New Jersey,
Law Division, Monmouth County, Docket No. L-
4440-08.

G. Martin Meyers argued the cause for
appellants (Law Offices of G. Martin Meyers,
P.C., attorneys; Mr. Meyers and Justin A.
Meyers, on the briefs).

Jason R. Schmitz argued the cause for respondent (Littleton Joyce Ughetta Park & Kelly, LLP, attorneys; Mr. Schmitz, Robert J. Kelly and James C. Ughetta, on the brief).

PER CURIAM

Plaintiffs Carl and Gloria Lawson brought this products liability case against defendant Bell Sports USA (Bell),[1] the manufacturer and distributor of a bicycle helmet and, following an adverse jury verdict, now appeal from the resulting judgment. We affirm.

I.

Carl Lawson was mountain biking when he lost control and flipped over the handle bars. He landed on his head and sustained quadriplegic injuries. He was wearing a Bell Solar Fusion bicycle helmet at the time of the accident.

Plaintiffs alleged that the elongated "teardrop" design of the helmet was a design defect under the New Jersey Product Liability Act, N.J.S.A. 2A:58C-2(c), which provides, in pertinent part:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for

---

[1] Bell Sports, Inc. and Easton-Bell Sports, Inc. were improperly pled as Bell Sports USA. The claims against other defendants alleged in the complaint have all been resolved.

its intended purpose because it . . . was designed in a defective manner.

Plaintiffs' evidence included the expert testimony of Zafer Termanini, M.D., who was qualified as an expert in orthopedics, biomechanics and product design. He concluded the teardrop design of the helmet was a defect that rendered it unreasonably dangerous for three reasons. He stated the teardrop design had a propensity to interfere with the completion of a somersault, which is the best thing a bicyclist can do in an over-the-handlebars accident. He opined that if Lawson had been able to complete a somersault, he would have suffered little or no injury to his spine. Dr. Termanini also stated that, because the teardrop had a propensity to dig into the surface of a soft bicycling trail like the one where the accident occurred, it had the capacity to constrain the movement of the head upon impact, increasing the severity of the injuries to the cervical spine. The third reason given by Dr. Termanini was that the teardrop can impose rotational forces on the head and neck that can also enhance the severity of injuries. Dr. Termanini opined that the teardrop design of the helmet was either the cause of or a substantial factor in exacerbating Lawson's cervical fractures and quadriplegia. Plaintiffs claimed a reasonable alternative design, a more rounded helmet, would have prevented Lawson's injuries.

A-3909-14T1

Plaintiffs argue that the following errors warrant a reversal of the judgment and a new trial: (A) the denial of their adjournment request; (B) the trial judge's evidentiary ruling that a specific article did not qualify as a learned treatise; (C) the trial judge's evidentiary ruling to admit evidence regarding the lack of prior neck injuries; (D) the fact that the defense was permitted to have two attorneys deliver its closing statement; (E) the jury charge and verdict sheet; and (F) the trial judge's refusal to provide the jury with a copy of an email that had been read but not admitted into evidence. We have considered these arguments in light of the record and applicable law and conclude none have merit. Moreover, we conclude that the challenge to the defense summation, raised as plain error, R. 2:10-2, lacks sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

## II.

In August 2014, a peremptory trial date was scheduled for March 23, 2015. The date was set without any input from the parties. Plaintiffs made their first and only adjournment request shortly thereafter because Dr. Termanini, their "key helmet design and injury causation expert," was to attend an annual conference of orthopedic surgeons that week. They contend that, pursuant to Rule 4:36-3(c), their request should have been accommodated. Plaintiffs argue that the trial court's denial of their adjournment

request constituted a manifest denial of justice, requiring a new trial. We disagree.

A "trial court's decision to grant or deny an adjournment is reviewed under an abuse of discretion standard." State ex rel. Comm'r of Transp. v. Shalom Money St., LLC, 432 N.J. Super. 1, 7 (App. Div. 2013). "Ordinarily, [an appellate court will] not interfere with a motion judge's denial of a request for an adjournment unless it appears that an injustice has been done." Rocco v. N.J. Transit Rail Operations, Inc., 330 N.J. Super. 320, 343 (App. Div. 2000).

Rule 4:36-3(b) provides, in pertinent part:

> An initial request for an adjournment for a reasonable period of time to accommodate . . . the unavailability of . . . a witness shall be granted if made timely in accordance with this rule. The request shall be made in writing stating the reason for the request and that all parties have consented thereto. . . .

Bell contends that plaintiffs were not entitled to the benefit of this rule because it would not consent to the adjournment and plaintiffs' request did not include a proposed trial date agreed upon by all parties. The issue of consent is not dispositive, however, as the rule states, "If consent cannot be obtained or if a second request is made, the court shall determine the matter by conference call with all parties." Ibid.

5

The scheduled trial date was more than six years after an amended complaint was filed in this case. The trial judge stated she "seriously doubted" that plaintiffs would get to Dr. Termanini's testimony during the week of March 23rd due to jury selection, opening statements and pretrial issues that would need to be resolved. She found there was no reasonable basis to adjourn the trial date and did not anticipate a problem if "some minor accommodation of timing [was] needed."

Rather than avail themselves of the accommodation offered by the trial judge, plaintiffs elected to videotape Dr. Termanini's testimony. Although they presented the testimony of their other experts by videotape,[2] plaintiffs argue they were severely prejudiced by being forced to present this key witness's testimony by videotape. The fact remains, however, that Dr. Termanini's testimony was provided to the jury for its consideration.

We agree with plaintiffs that it is preferable for a peremptory trial date to be scheduled with the input of the parties. And, in the absence of consent, the trial judge should conduct a conference pursuant to R. 4:36-3(b) to select the date. We cannot agree, however, that the denial of plaintiffs'

---

[2] Plaintiffs presented videotaped testimony from: Haim Blecher, Lawson's orthopedic surgeon; Todd A. Linsenmeyer, Lawson's urologist; and Barbara Benevento, the physiatrist who treated Lawson at the Kessler Institute following the accident.

adjournment request constituted an abuse of discretion on this record where the trial judge reasonably concluded it was unlikely plaintiffs would need to present Dr. Termanini during the first week of trial and expressed a willingness to make accommodations for his schedule. Further, the case was over six years old and plaintiffs were not deprived of the opportunity to present Dr. Termanini's testimony, albeit by videotape.

III.

The trial judge granted Bell's motion to exclude an article relied upon by Dr. Terminani titled "Vents and Square Lines: Problems With Some Designs" (the Square Lines article), published on the website of the Bicycle Helmet Safety Institute (BHSI). Plaintiffs argue the trial judge's failure to recognize this article as a learned treatise "constituted a manifest denial of justice, warranting a new trial."

Our review of a trial court's evidentiary ruling "is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). We discern no abuse of discretion here.

Close to one year after discovery ended, Dr. Termanini provided the Square Lines article as a supplement to his expert report. In a letter accompanying the article, he stated:

> I am writing to bring to your attention an article I recently located, made available online by the Bicycle Helmet Safety Institute, entitled "Vents and Square Lines: Problems with some designs." <u>Although I did not specifically rely upon this article</u> in reaching the opinions I have provided in this case, regarding the defective design of the Bell helmet Mr. Lawson was wearing at the time of his accident, I believe this article provides direct support for the scientific validity of the opinions I reached through my own independent analysis of the design of that helmet.
>
> [(Emphasis added).]

The Square Lines article did not identify its author. And, as stated in his letter, Dr. Termanini did not rely upon the article in forming his opinion.

Defense expert, Peter D. Halstead, chairman of the American Society of Testing and Materials subcommittee for protective headgear, responded to Dr. Termanini's supplemental submission and identified the author of the article as Randy Swart, a consumer advocate. Halstead characterized the article "more as a blog than science [that was] not appropriate for any expert to rely on as scientific support for an opinion."

Bell filed a motion in limine to bar portions of Dr. Termanini's testimony related to several exhibits produced after discovery ended, including the Square Lines article. The trial judge considered whether each of the challenged exhibits qualified

as a learned treatise under <u>N.J.R.E.</u> 803(c)(18), granted the motion

as to the Square Lines article and denied the motion as to four

other exhibits.[3]

The trial judge granted Bell's motion to exclude the Square

Lines article.  She noted that Dr. Termanini did not identify what

the BHSI was, who authored the article and that she could not

"tell that it was published in any kind of scholarly journal."

The following testimony by Dr. Termanini was excluded as a result:

> Q.   Okay.  Let me show you what we've
> marked as Dr. Termanini P-12 for purposes of
> your testimony today.
>
> . . . .
>
> Q.   And ask you, is that another article
> by the Bicycle Helmet Safety Committee?
>
> A.   Yes.  It's a P-12, and "Vents and
> Square Lines: Problem with some designs."
>
> . . . .
>
> Q.    Is there . . . anything in that
> article that you believe has a bearing on your
> conclusions you have reached in this case?
>
> . . . .

---

[3]   The trial judge denied Bell's motion as to the following exhibits: P-5, a document titled "The Complete Guide to Public Safety Cycling"; P-9, a document titled "Spinal Column and Spinal Cord Injuries in Mountain Bikers" from <u>The American Journal of Sports Medicine</u>; P-10, a document authored by Professor Hugh Hurt from the Bicycle Helmet Safety Institute [BHSI] and P-13, a document titled "A Helmet for Prevention and Mitigation of Spinal Column and Spinal Cord Injuries in Head-First Impact."

A.    Yeah.  "The fashion among helmet designers since 1998 has favored squared-off edges of the foam remaining around the vents, and the addition of sharp lines in the exterior plastic just for style.  The elongated 'aero' shape dates from that era as well.  This is not an optimal design for crashing.  We believe that the ideal surface for striking a road resembles a bowling ball: Hard, smooth and round.  Round shells reduce to a minimum any tendency for a helmet to 'stick' to the surface when you hit, with the possibility of increasing impact intensity, contributing to the rotational brain injury or jerking the rider's neck.  They also eliminate the aero [tail] that can snag or in a backward impact can shove [the] helmet aside as you hit, exposing your bare head."

.  .  .  .

Q.    Go ahead.  Do you have any more?

A.    Okay.  "Dr. Hurt has asked ASTM to consider modifying its bicycle helmet standard to eliminate aero tails and elongated design.  His e-mail on this subject is illuminating."

"In the real world, people don't use duct tape, and they don't even adjust their straps well.  So our advice is to avoid those elongated [aero] designs.  In fact, they don't give you any real aero advantage until you reach racing speeds anyway.  For most riders, they are not useful."

Q.    Now, they mention the aerodynamic aspect.  Did you reach any conclusions yourself about the benefits, if any, of this so-called aeronomic [sic] design for recreational riders?

A.    Well, the speed of a mountain biker, dirt road biker doesn't exceed 25. . . .  I personally tried to measure that, and some

10

> biker[s] will go to 26, 27 miles per hour;
> but . . . the terrain doesn't allow speed.
> It's not like going in an arena, and these
> speed bikes can go up to 70 miles per hour.
>
> Q. Did you reach a conclusion as to
> whether there was any aerodynamic benefit at
> all for a recreational rider in a teardrop
> shape?
>
> A. For [a] recreational rider, there is
> no advantage whatsoever.

The language in quotation marks within the block quote was read by Dr. Termanini directly from the Square Lines article during his de bene esse testimony. Defendants objected to the quoted language as hearsay. Plaintiffs countered that the Square Lines qualified as a learned treatise, N.J.R.E. 802, and therefore was an exception to the hearsay rule pursuant to N.J.R.E. 803(c)(18). The hearsay exception applies to

> statements contained in published treatises,
> periodicals, or pamphlets on a subject of
> history, medicine, or other science or art,
> established as a reliable authority by
> testimony or by judicial notice. If admitted,
> the statements may not be received as exhibits
> but may be read into evidence or, if graphics,
> shown to the jury.
>
> [N.J.R.E. 803(c)(18).]

"[L]earned treatises are inadmissible hearsay when offered to prove the truth of the matter asserted therein because the author's out-of-court statements are not subject to cross-examination." Jacober v. St. Peter's Med. Ctr., 128 N.J. 475, 486

11

(1992).  Under <u>Jacober</u>, "a text will qualify as a 'reliable authority' if it represents the type of material reasonably relied on by experts in the field."  <u>Id.</u> at 495.  "[T]he focus should be on what the experts in fact rely on, not on whether the court thinks they should so rely."  <u>Id.</u> at 495-96 (quoting <u>Ryan v. KDI Sylvan Pools, Inc.</u>, 121 <u>N.J.</u> 276, 289 (1990)).  If there is any doubt as to the reliability of the text, the court should conduct a hearing, "either before or during the trial, to determine whether the text qualifies as a learned treatise."  <u>Id.</u> at 496.

No <u>Rule</u> 104 hearing was requested or held to determine whether the Square Lines article constituted a learned treatise.  Plaintiffs argue the trial judge erred in granting the motion without sua sponte conducting a <u>Rule</u> 104 hearing.  They assert that Bell was aware of the article and Dr. Terminani's reliance upon it for almost eighteen months before trial and delayed in moving to exclude the article to prejudice plaintiffs.  They also state the article "was of critical importance" to their "'design defect' case, because it concluded that 'teardrop'-shaped helmets," like the one worn by Lawson at the time of the accident "were dangerous."

As noted in <u>Jacober</u>, a <u>Rule</u> 104 hearing may be held "either before or during the trial."  <u>Id.</u> at 496.  See <u>Cho v. Trinitas Reg'l Med. Ctr.</u>, 443 <u>N.J. Super.</u> 461, 470-71 (App. Div. 2015)

(observing that in limine rulings on evidence questions are generally disfavored), <u>certif. denied</u>, 224 <u>N.J.</u> 529 (2016). To support their argument, plaintiffs have submitted materials to the court that were not presented to the trial judge and were not the subject of a motion to supplement the record. Because these materials are not part of the record, we do not consider them in our review. <u>See</u> <u>R.</u> 2:5-4(a); <u>Townsend v. Pierre</u>, 221 <u>N.J.</u> 36, 45 n.2 (2015).

Before the trial court, plaintiffs presented the Square Lines article as "another article by the [BHSI]." Plaintiffs failed to identify the author of the article or offer sufficient information about the BHSI to permit a reasonable analysis and conclusion that the article was a "reliable authority" or an authority actually relied upon by experts in the field. We therefore discern no error in the trial judge's decision to exclude this evidence.

Moreover, plaintiffs were not precluded from presenting other evidence that was probative of the points they sought to prove through the excluded reference. The trial judge permitted Dr. Termanini's testimony as to exhibit P-10, another article that appeared on the BHSI website titled "Professor Hugh Hurt Weighs In: Testing Shows Aero Helmets are a Problem" (the Hurt email). Dr. Termanini was permitted to read portions of Professor Hurt's email, which are arguably more persuasive than the Square Lines

article that was excluded, and which Dr. Termanini said addressed the same design concerns he had identified in this case:

> A.   Reading from P-10.  "During the last couple of years, the technical staff at HPRL" — which is the Bicycle Helmet Safety Institute — "has encountered an . . . interesting and possibly dangerous problem with the aerodynamic shape or streamlined bicycle helmet.  These popular helmets have a teardrop design which taper to a wedge at the rear of the helmet supposedly reducing the aerodynamic drag along with increased ventilation through the many openings of the shell.  The [ad]verse effect of this aerodynamic shape is that the wedge at the back of the helmet tends to [d]eflect and rotate the helmet on the head when impact occurs there.  Any impact at the front or the side of the streamlined helmet is no different from any other helmet, but any impact at the rear wedge tends to rotate the helmet on the head probably deflecting the helmet to expose the bare head to impact, and at worst, ejecting the helmet completely from the head."

> . . . .

> "Actually, everybody who has tested these streamlined helmets over the past year has encountered the same due to the problem of this helmet being displaced during impact testing at the rear wedge."

> . . . .

> "We request . . . that F08.53 committee study this problem and develop advisory information for both manufacturer[s] of this streamlined helmet and consumer bicyclist[s] who now own and wear such helmet[s].  There is a definite hazard for displacement or ejection from impact on the rear wedge of

these helmets and bicyclists should be warned
of this danger by an authority such as ASTM."

IV.

Plaintiffs also argue the trial court erred in allowing Thom Parks, Vice President of Corporate Affairs for Bell, to testify over their objection that there had been no other claims or lawsuits against Bell alleging that the style of helmet worn by Lawson caused a cervical injury. We review this challenged evidentiary ruling for abuse of discretion. See Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016), and find none.

The "Rules of Evidence do not prohibit other accident, or lack of other accident, evidence." Schaefer v. Cedar Fair, L.P., 348 N.J. Super. 223, 239 (App. Div. 2002). In Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276 (1990), a design-defect failure-to-warn case, the Supreme Court found reversible error in the trial court's exclusion of expert testimony regarding the rarity of spinal-cord injuries from similarly designed pools and diving boards. Id. at 290. The Court observed that "the core of defendant's liability rested on the product's potential or propensity for harm." Ibid. Because the jury had to "evaluate the likelihood of such harm," the Court concluded the defendant was prejudiced when "deprived of the opportunity to show the jury that there has been only an infinitesimal number of serious accidents in pools with diving

boards that conform to industry standards." <u>Ibid.</u> The Court stated:

> Evidence of prior similar accidents is relevant and should be admissible as evidence of the risk, or lack thereof, of a product. . . . Information compiled and used by members of the swimming-pool industry, . . . concerning frequency of serious injuries resulting from diving accidents is precisely the kind of information that might assist a jury in determining the safety of the product.
>
> [<u>Ibid.</u>]

Relying upon <u>Schaefer</u>, <u>supra</u>, 348 <u>N.J. Super.</u> at 233-34, 239-40, plaintiffs argue that Bell should have been precluded from offering evidence regarding the absence of prior neck injuries because they did not introduce evidence of prior accidents.[4] Plaintiffs' reliance is misplaced because <u>Schaefer</u> did not establish such a condition for the admissibility of evidence regarding the absence of prior accidents. <u>Id.</u> at 239-40.

Plaintiffs also argue that insufficient foundation was provided for Parks's testimony. They claim that Bell needed to provide records demonstrating the safety history of the helmet before Parks could testify regarding the helmet's safety record. We disagree.

---

[4] Dr. Termanini did testify, however, that the teardrop design of the helmet was "notorious" for causing the rotational forces that resulted in Lawson's injuries.

Parks testified that he began working for Bell in 1998, became its Director of Corporate Affairs in 2000 and was in charge of safety and standards. Part of his job was keeping track of claims and litigation. Any time there was a lawsuit, he worked with the attorneys to "provide technical backup" and to investigate the claims. He was responsible for knowing about all claims or lawsuits against Bell relating to helmets. He also testified that Bell began selling the Solar Fusion helmet in 2005, that it was a recreational helmet designed to be used by a variety of cyclists including mountain bikers and was Bell's best-selling helmet with over four million sold.

The trial judge concluded that the system Bell had in place for the gathering and review of complaints and Parks's personal knowledge of the complaints provided a proper foundation for the introduction of testimony regarding the lack of prior injuries similar to Lawson's. We discern no abuse of discretion in this ruling.

V.

Shortly after deliberations began, the jury requested a copy of the "safety guide for police, et cetera." Both plaintiffs and Bell agreed to provide the jury with "The Complete Guide to Public Safety Cycling" in response to this request and the court did so. The jury then requested a copy of the Hurt email. Plaintiffs

argue that the trial judge erred in failing to clarify what the jury meant by "et cetera" in its first request and declining to provide the jury with a copy of the Hurt email or to grant its alternative request that the email be read to the jury. This argument merits only limited discussion. R. 2:11-3(e)(1)(E).

As a preliminary matter, plaintiffs' argument regarding the failure to clarify the jury's first request is entirely lacking in merit since they agreed with the trial judge's response to the request. See N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 340 (2010).

Turning to the Hurt email, the trial judge earlier permitted Dr. Terminani's testimony in which he read the Hurt email, over Bell's objection, finding it qualified as a learned treatise. The email itself was not admitted into evidence. When the jury requested a copy, Bell objected. The trial judge properly denied the jury's request pursuant to N.J.R.E. 803(c)(18), which provides "the statements may not be received as exhibits." The judge found that providing the email to the jury would be "highly prejudicial" in light of "extraneous language on the document."

The decision whether to read back testimony to the jury is one that lies within the discretion of the trial judge. State v. Wilson, 165 N.J. 657, 660 (2000). Here, the jury did not request a readback of Dr. Termiani's testimony; they requested a copy of

the email referenced within his testimony.  The trial judge

considered plaintiffs' alternative request that the email be read

to the jury and stated:

> And again, the proposal that it simply be read
> again, the jury has not asked to hear
> testimony about this document; and if they do,
> we'll address that question as it comes.  But
> just to read it in, again, I think highlights
> the document in a prejudicial way and it
> effectively is making an end run around [R.]
> 803(c)(18).  So I'm going to deny the request.

In an apparent response to the stated concern of plaintiffs'

counsel that the jury might consider this document less significant

because the court had provided them with a copy of the first

document they requested, the judge advised counsel she would remind

the jury that she made rulings based upon the law; the rulings did

not reflect any opinions of hers about the merits of the case and

that the jury alone was the judge of the facts.  There was no

objection to this procedure.

The trial judge considered the request to read the email and

gave a thoughtful reason for her decision not to do so.  While

there might have been other reasonable approaches to the issue,

we cannot say that the choice she made constituted an abuse of

discretion.

VI.

Plaintiffs argue the trial judge erred in providing the jury

19

with an instruction that was prejudicial to them. Because plaintiffs did not object to the charge at trial, we review this argument for plain error, R. 2:10-2; State v. Munafo, 222 N.J. 480, 488 (2015); accord R. 1:7-2, and find none.

The jury instruction given by the trial judge was the Model Jury Charge (Civil), 5.40D-4(4), "Design Defect—Defenses," "State of the Art/Common Standards" (2001), which the judge modified only to include the underlined language:

> There has been evidence presented of the common practice and standards in the industry, including the Consumer Product Safety Commission Safety Standard For Bicycle Helmets. That evidence bears upon the reasonable alternative design analysis that you were asked to make here in order to measure the reasonableness of the design of the product. Compliance with the common practice or industry standard does not mean that the helmet is safe. It may still be found to be defective in design. However, that compliance, along with all the other evidence in this case, may satisfy you that the helmet was properly made.

Plaintiffs had requested that the language be modified to read: "the compliance or noncompliance with a standard or regulation may be considered by you along with all the other evidence in this case, on the question of whether the helmet was or was not properly made." The court denied plaintiffs' request and plaintiffs posed no objection to the charge thereafter.

Plaintiffs argue the jury charge given by the court was

prejudicial because "by failing to even mention the possibility of a finding by the jury of Bell's 'noncompliance' [with 16 C.F.R. § 1203.5 (2016)], the trial court virtually guaranteed that such a finding would not be made." We disagree.

"'[A] trial court is not bound to instruct a jury in the language requested by a party. If the subject matter is adequately covered in the text and purport of the whole charge, no prejudicial error comes into existence.'" Bolz v. Bolz, 400 N.J. Super. 154, 163 (App. Div. 2008) (quoting State v. Thompson, 59 N.J. 396, 411 (1971)). Here, the charge given by the court adequately covered the subject matter and the failure to mention "noncompliance" was not "clearly capable of producing an unjust result." R. 2:10-2.

Plaintiffs also argue that although the trial judge instructed the jury regarding "crashworthiness," her failure to include an interrogatory addressing "crashworthiness" on the jury verdict sheet warrants a new trial. This argument lacks merit because, although plaintiffs proposed such an interrogatory, they later agreed that the language of the first question should mirror the language in the product liability statute, N.J.S.A. 2A:58C-2. See M.C. III, supra, 201 N.J. at 340.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3909-14T1