United States Court of Appeals,

Fifth Circuit.

No. 92-7047.

James L. JOHNSON, Plaintiff-Appellant,

v.

FORD MOTOR COMPANY and Ford Motor Company of Canada, Ltd., Defendants-Appellees.

April 19, 1993.

Appeal from the United States District Court for the Southern District of Mississippi.

Before KING and EMILIO M. GARZA, Circuit Judges, and COBB,[*] District Judge.

PER CURIAM:

nci Darlene Johnson died in an automobile accident on November 25, 1985 while driving her 19831/2 model Ford Escort. In May 1990, James L. Johnson, the father of the deceased, brought this action against Ford Motor Company and Ford Motor Company of Canada, asserting that his daughter's Escort was defective and unreasonably dangerous and that this resulted in her death. The case was tried before a jury, which found that the Escort was not defective and unreasonably dangerous, and that Ford was not negligent. The district court entered judgment accordingly, and Johnson now appeals from that judgment, alleging several evidentiary errors and challenging a remark made by Ford's counsel during its closing argument. Finding no error, we affirm.

I. BACKGROUND

In November 1985, Nanci Darlene Johnson ("Darlene") was driving her Ford Escort under rainy conditions on a two-lane highway running through Mississippi. The 19831/2 Escort was manufactured in June 1983, and it had been driven approximately 24,000 miles at the time of the accident. The vehicle's front tires had a reasonable amount of tread remaining on them, but the back tires were nearly slick. For whatever reason, Darlene lost control of the car, spun into the other lane, and collided with a pickup truck driven by Kathyleen Sammons. Darlene was killed instantly.

A. *Spoilation of the Evidence*

_____

[*]District Court Judge of the Eastern District of Texas, sitting by designation.

After the accident in November 1985, the Escort was moved numerous times and stored under various conditions: first, the vehicle was towed to a garage where it was stored for a few months; it was then moved to another location, and stored in a building for one month; the vehicle was then moved again, this time to a body shop where it was inspected and photographed; and the vehicle was then transported to a house, where it was stored outside and on grass for approximately two years. During the time it was stored outside and on grass, the Escort was examined again; the wheel cylinders were removed from all four wheels, and more photographs were taken. In May 1988, the car was towed ten miles to another house and, three months later, it was moved yet again to a location where it was stored in a shed with a sand floor. Apparently no attempts were made to protect any parts of the car during this series of moves and periods of storage. Finally, the Escort was transported to Ohio, where experts examined and photographed the "C.V. joint assembly," and then thoroughly cleaned and degreased the parts, removing all of the allegedly contaminating debris.

B. *Proceedings*

James L. Johnson, the father of Nancy Johnson, brought this action against the Ford Motor Company and Ford Motor Company of Canada, Ltd. (together "Ford") some five years after his daughter's accident. Before trial, Ford moved for summary judgment, arguing that key evidence had been altered or destroyed by the repeated moving and outside storage of the car, and by the cleaning of contaminants from its parts. Johnson argued that, because he had not yet filed his lawsuit, he was not required to preserve the contaminants. Although the district court denied Ford's motion, it allowed Ford the opportunity to argue spoilation to the jury at trial.

The case proceeded to trial on December 2, 1991. During the course of trial, Johnson produced eleven witnesses, and more than one hundred of his exhibits were received into evidence. Johnson's theory at trial was that a flexible rubber boot covering a "left inboard C.V. joint" on the front of the Escort was torn prior to Darlene's accident, thereby allowing microscopic debris to contaminate the joint. According to Johnson, this contamination of the joint made it seize and act like a brake on the left front wheel, and caused Darlene's car to pivot around that wheel and into the path of the oncoming pickup truck.

Plaintiff's expert, Larry Bihlmeyer, a former Ford engineer, theorized that the C.V. joint assembly had numerous design and manufacturing defects. Specifically, he asserted that: a "boot" component of this assembly had two design and two manufacturing defects; a retainer inside the boot had four design defects; and the clamp holding the boot had two design defects and a manufacturing defect. Bihlmeyer also cited seven alleged defects in the "halfshaft assembly"[1] based on the theory that a sharp screw cut the boot while the car was being assembled. According to Bihlmeyer, there was inadequate clearance between the retainer and the boot, and, because the material used to manufacture the boot was too thin, it tore too easily. Bihlmeyer substantiated this testimony by introducing an exhibit which showed that Ford had received numerous warranty claims involving split or torn boots and contaminated C.V. joints on another line of its cars. Finally, according to Bihlmeyer, the complexity of having one boot fit several different C.V. joints constitutes a design defect.

In response, Ford freely admitted that the inboard C.V. joint boots can get torn, and that, as a result, contaminants may enter the joint. Ford also admitted that the stamped metal retainer used on Darlene's Escort could cut the boot and that, in its owner's manuals, Ford actually told its customers that they should inspect the C.V. joint boots periodically for signs of leakage and splitting. However, Ford contended that the C.V. joint on Darlene's Escort was contaminated *during or after* the accident. Ford also contended that contamination of the C.V. joint could not result in the joint seizing and creating a loss of steering control, and that the worst thing that could result from contamination of the inboard C.V. joint would be some vibration, clanking, and noise. According to Ford, Darlene's accident must have been caused by road conditions and driver error.

The case was submitted to a jury on theories of strict liability and negligent design and manufacture. After two hours of deliberation, the jury unanimously found that the Escort was neither defective nor unreasonably dangerous, and that it was not negligently designed or manufactured. Rather than moving for a new trial, Johnson directly appealed to this court.

---

[1]According to the parties' briefs and the record, this assembly is either inclusive of or part of the C.V. joint assembly.

## II. DISCUSSION

Johnson raises two categories of error on appeal. First, he asserts that the district court abused its discretion in refusing to admit several documents into evidence. Second, Johnson contends that the district court abused its discretion by overruling his objection to remarks made in Ford's closing argument concerning Johnson's alleged failure to produce any evidence that the C.V. joint assembly had ever caused an accident resulting in personal injury.

A. *Evidentiary Rulings*

Johnson raises a number of challenges to the district court's evidentiary rulings, most of which were made pursuant to Rule 403 of the Federal Rules of Evidence. Rule 403 provides that:

> [a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

This court has recognized that, because of his or her involvement in the trial, a district court judge often has superior knowledge and understanding of the probative value of evidence. *See Hardy v. Chemetron Corp.,* 870 F.2d 1007, 1009 (5th Cir.1989). Therefore, we show considerable deference to the district court's evidentiary rulings, reviewing them only for abuse of discretion. *See Sullivan v. Rowan Companies, Inc.,* 952 F.2d 141, 146 (5th Cir.1992); *Seidman v. American Airlines, Inc.,* 923 F.2d 1134, 1138 (5th Cir.1991); *Jackson v. Firestone Rubber Co.,* 788 F.2d 1070, 1075 (5th Cir.1986). In fact, we will reverse a judgment based on an improper evidentiary ruling "only where the challenged ruling affects a substantial right of a party." *Jones v. Benefit Trust Life Ins. Co.,* 800 F.2d 1397, 1400 (5th Cir.1986); *see also* FED.R.EVID. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence *unless a substantial right of the party is affected....*") (emphasis added).

With this standard in mind, we now consider Johnson's challenges to the district court's refusal to admit (1) evidence regarding other lawsuits and claims against Ford, (2) a Ford interoffice memorandum, and (3) certain evidence regarding the wire ring retainer. Johnson also challenges statements made by Ford during its closing argument.

1. Other Lawsuits and Claims

Johnson's first evidentiary challenge involves evidence of five other lawsuits against Ford and claims made by four other customers. Ford moved in limine to prohibit Johnson from presenting this evidence, and, to show the court the nature of the allegations in these other cases, attached copies of the complaints and customer letters to its motion.[2] In short, Ford argued that (1) these other lawsuits are not relevant because their facts and circumstances are not substantially similar to the facts

[2]In the brief its has submitted to this court, Ford summarizes these other cases and complaints as follows:

> (1) *Barton v. Ford Motor Company.* The complaint in this case was filed in 1987. The lawsuit involved a *1985 Mercury Topaz.* Plaintiff alleged that the vehicle was defective and that the defect "resulted in an inability to maintain control over the vehicle by the operator thereof...."

> (2) *Fletcher v. Ford Motor Company.* The complaint in this case was filed on May 21, 1985. The lawsuit involved a *1982 Ford EXP.* Plaintiff alleged that while driving the EXP, "the wheel and axle assembly broke."

> (3) *Knox v. Ford Motor Company.* The complaint in this case was filed in May 1985. Plaintiffs alleged that in May 1984, a *1983 Mercury Lynx* that Mrs. Knox was driving "began to "bounce all over the road.' " Plaintiffs further alleged that they "do not have [sic] know the cause of the product failure."

> (4) *Lomeo v. Ford Motor Company.* This case involved a *1985 Ford Tempo.* Plaintiff alleged that "the left front wheel did become unattached from the motor vehicle through no fault or action of the plaintiffs, causing said vehicle to go out of control...."

> (5) *Webb v. Ford Motor Company.* This case concerned an accident that occurred in late 1985 and involved a 1985 Escort. Plaintiff alleged that the Escort "suffered a mechanical failure and struck a guardrail."

> (6) Blakeney claim. Mr. Blakeney wrote to Ford claiming that, in January 1984, the axle on his *1982 Mercury Lynx* broke and the car went off the road.

> (7) Brenner claim. Ms. Brenner alleged that in 1985 the axle on her *1984 Tempo* "snapped," the ball bearings came apart, and the left front wheel fell off, causing her to lose control of the car.

> (8) Caruso claim. According to a Ford "Field Contact Report" dated October 31, 1985, Mr. Caruso, who was an employee of a Ford dealership, stated that he "unexpectedly lost control" of a *1985 Tempo* and went into a ditch. According to the report, "dealership personnel" expressed an opinion that "the half shaft CV joint broke allowing the half shaft to break the steering linkage which caused the loss of control."

> (9) Pleasant claim. In a letter to Ford dated August 1985, the Pleasants stated that the *axle* on their 1983 Escort "disintegrated," causing the driver to lose control of the car.

and circumstances in the case before us, and, (2) even if relevant, these other unadjudicated claims and lawsuits constitute mere hearsay which is more prejudicial than probative. Rather than showing substantial similarity, Johnson argued that these other lawsuits (1) are relevant to the issue of notice and (2) constitute the type of evidence commonly relied upon by experts to establish the existence of a defect.

Similarly, Johnson attempted to admit two letters from the National Highway Traffic Safety Administration (NHTSA) to Ford, and a responsive letter by Ford. The letters from the NHTSA state that the agency received twenty-four reports of alleged steering system failures in its 1984 Tempo and Topaz vehicles and twenty-five reports of alleged transaxle halfshaft assembly failures in its 1984-1986 Tempo and Topaz vehicles. The NHTSA asked Ford to provide copies of owner complaints and to identify and describe all accidents and lawsuits known to Ford pertaining to the alleged defect. Ford's letter to the NHTSA provided all the information requested, and an attachment to the letter summarized the two accident reports and three lawsuits "alleging failure, separation, malfunction or similar unsatisfactory performance of transaxle halfshaft assemblies in 1984-1987 Tempo and Topaz vehicles."[3] Again, Ford moved in limine to exclude this evidence on the grounds that: the letters constitute hearsay; the information they contain is irrelevant because it pertains to other vehicle lines and concerns different defects; and, to the extent it is relevant, information in the form of correspondence with an agency charged with ensuring highway safety would be more prejudicial than probative. The district court granted Ford's motions to prohibit Johnson from presenting this evidence. The court based its rulings on findings that the evidence at issue constitutes hearsay, the probative value of which is substantially outweighed by the unfair prejudice that would result from its admission.

On appeal, Johnson reasserts his contentions that this evidence is relevant and that it has probative value outweighing its prejudicial effect. We reject Johnson's assertions for the following reasons:

---

[3]One of the accident reports involved the Caruso claim; two of the lawsuits were the Barton and Lomeo actions; and the incidents underlying the remaining lawsuit and accident report occurred after the Johnson accident. *See supra* note 2.

*Ford's summary of claims and lawsuits.* This is the same type of evidence which this court found to constitute inadmissible hearsay in *Roberts v. Harnischfeger Corp.,* 901 F.2d 42, 44-45 (5th Cir.1989). In *Roberts,* the plaintiff sought to introduce an affidavit of an employee of the defendant that briefly summarized copies of notices of pending litigation against the defendant, along with other reports concerning the allegedly defective products. This court held that the evidence was properly excluded because "Harnischfeger did not prepare the notices and reports, and the allegations made therein were hearsay." 901 F.2d at 45. Similarly, in the case at issue, Johnson has attempted to introduce a brief summary of claims, lawsuits, and complaints (as opposed to a summary of Ford investigations and tests, for example), which amounts to nothing more than a summary of allegations by others which constitute hearsay.

*Evidence of other accidents.* When evidence of other accidents or occurrences is offered for any purpose other than to show notice, the proponent of that evidence must show that the facts and circumstances of the other accidents or occurrences are "closely similar" to the facts and circumstances at issue. *See McGonigal v. Gearhart Industries, Inc.,* 851 F.2d 774, 778 (5th Cir.1988); *Jackson v. Firestone Tire & Rubber Co.,* 788 F.2d 1070, 1082-83 (5th Cir.1986). Moreover, even when a substantial similarity of circumstances is established, the district court has broad discretion to exclude such evidence under Rule 403 of the Federal Rules of Evidence. *See* FED.R.EVID. 403.

None of the other alleged accidents at issue appear to have involved the precise mechanical defect alleged by Johnson.[4] Moreover, all of these complaints and claims involved either different models of Ford vehicles or Escorts with model years different from the 19831/2 Ford Escort driven

---

[4]Specifically, as summarized in Ford's brief, in *Barton,* the alleged defect was simply a "failure" of the left halfshaft assembly; in *Fletcher,* "the wheel and axle assembly [allegedly] broke ... causing the vehicle to leave the travelled portion of the highway ..."; the car in *Knox* allegedly "bounce[d] all over the road" from some unknown cause; in *Lomeo,* the plaintiff alleged that the left front wheel became unattached; the issue in *Webb* was a general allegation of "mechanical failure"; Blakeney reported that the "axil [sic] broke and the car went off the road"; Brenner reported that the "axle had snapped"; Caruso reported that the "half shaft CV joint broke allowing the half shaft to break the steering linkage which caused loss of control"; and Pleasant reported that "[t]he front axle disintegrated...."

by Darlene at the time of her accident.[5]  Nevertheless, in response to Ford's motion in limine, Johnson asserted that this evidence regarding other accidents and claims was relevant to the issue of notice—thereby relaxing the "substantial similarity" requirement for admissibility.  *Jackson,* 788 F.2d at 1083 (the "substantial similarity" requirement for admissibility is relaxed when evidence of other accidents is offered solely to show notice).  However, even when it is offered solely to show notice, the proponent of such evidence must establish reasonable similarity.  *See Mills v. Beech Aircraft Corp., Inc.,* 886 F.2d 758, 762 (5th Cir.1989).

   In the case before us, Johnson has failed to establish any recognizable similarity between his claim and those that are the subject of the evidence at issue:  none of these other claims involved allegations that contamination in an inboard C.V. joint caused the steering mechanism to freeze up and the car to react as Johnson alleges Darlene's car reacted.[6]  Moreover, as stated by Ford,

> Johnson made no showing or even attempted to establish that Ford had notice of any of the claims or lawsuits before Darlene Johnson's accident in November 1985....  [T]here is no evidence that Ford was served with any of the complaints or received any of the claims before

---

[5]The following is a summary of the vehicles involved in these other alleged incidents, which are discussed *supra* at note 2:

| | |
|---|---|
| Barton: | 1985 Topaz |
| Blakeney: | 1982 Lynx |
| Brenner: | 1984 Tempo |
| Caruso: | 1985 Tempo |
| Fletcher: | 1982 EXP |
| Knox: | 1983 Lynx |
| Lomeo: | 1985 Tempo |
| Pleasant: | 1983 Escort |
| Webb: | 1985 Escort |

[6]For this same reason, we reject Johnson's assertion that this evidence of other occurrences is relevant and necessary to rebut statements made by Ford's witness, Jerry Mann, that he was not aware of any instances in which the inboard C.V. joint on a Ford vehicle "seized" and caused a loss of steering control.  As stated by Ford, "none of [the incidents at issue] involved an accident resulting from a contamination and seizure of an inboard C.V. joint;  thus, they were of no value in impeaching Mann's testimony."

November 1985. *See [Julander v. Ford Motor Co.,* 488 F.2d 839, 846 (10th Cir.1973) ].[7] Accordingly, we conclude that the district court did not abuse its discretion by refusing to admit this evidence.

*The NHTSA letters.* Johnson also challenges the district court's exclusion of NHTSA letters regarding a preliminary inquiry which did not result in any action by the NHTSA. Johnson asserts that these letters should have been admitted to impeach Mann's testimony that he was unaware of any incident in which an inboard C.V. joint seized and caused a vehicle to go out of control. *See supra* note 6. The letters at issue regard a NHTSA investigation, but they were not written to Mann and do not bear on Johnson's assertion that Mann was aware of these NHTSA inquiries. Moreover, beyond the fact that these were merely preliminary inquiries which did not result in any action by NHTSA, and the fact that they were directed at different lines of cars, as stated by Ford, "the "official' nature of the inquiries could have misled the jury into believing that "something' was wrong with Ford cars." *See Fowler v. Firestone Tire & Rubber Co.,* 92 F.R.D. 1, 2 (N.D.Miss.1980) (in addressing the inadmissibility of a NHTA report, stating that, "because this documentary evidence is in the form of reports promulgated by agencies of the United States government, its apparent "official' nature is likely to cause a jury to give the evidence inordinate weight"). Accordingly, we conclude that the district court did not abuse its discretion by refusing to admit the NHTSA correspondence.

*Summation.* The evidence at issue involves nine complaints regarding several lines of Ford cars and allegations of mechanical defects distinguishable from the defect alleged in the case before us. We hold, therefore, that the district court did not abuse its discretion in determining that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice to Ford. *See* FED.R.EVID. 403; *Hardy,* 870 F.2d at 1009; *Brooks v. Chrysler Corp.,* 786 F.2d 1191 (D.C.Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 185, 93 L.Ed.2d 119 (1986).[8]

---

[7]Footnotes and citations were omitted.

[8]In *Brooks,* plaintiffs alleged that the brake piston on a 1979 Chrysler LeBaron seized, causing the car to pull suddenly in the direction of the non-rotating wheel; the alleged defect was a dustboot which allowed contaminants to enter the mechanism. 786 F.2d at 1192. To substantiate this claim, plaintiffs sought to present exhibits to the jury relating to a 1978-80 NHTSA investigation into brake piston seizure in 1976-80 Chrysler vehicles—evidence which consisted

2. Ford's Inter-office Memorandum

Johnson also challenges the district court's refusal to admit a Ford inter-office memorandum which discusses a proposed owner-notification program for a problem caused by an alternator splash shield which was installed on certain 1984 Escort and Lynx cars. This memorandum recommended deferring the owner-notification program on the grounds that, "[w]hile there will be a potential for water and dirt to enter around the C.V. joint, it is not certain that this would adversely affect vehicle operation."

Johnson asserts that this memorandum is relevant to show that Ford knew its joint boots were being cut and that joints were being contaminated. However, Ford has not disputed these issues.[9] Johnson also argues that the memorandum constitutes "direct evidence that, prior to Darlene's death, Ford did consider that contamination of the C.V. joint might pose a threat to the safety of its drivers." Nevertheless, as stated by Ford, "[i]t is undisputed that the Johnson's Escort *was not equipped with this splash shield.* In fact, ... it was first introduced in the 1984 models. Thus, the documents had

---

primarily of 330 consumer complaints in which owners detailed their problems with their vehicles and how these problems interfered with the operation of their cars. *Id.*

> The district court excluded these exhibits, ruling that (1) they were hearsay, (2) plaintiffs failed to show that the occurrences were substantially similar, and (3) the minimal probative value of these exhibits would be substantially outweighed by the danger of unfair prejudice to Chrysler. 786 F.2d at 1193. The D.C. Circuit affirmed, holding that the evidence was properly excluded pursuant to Rule 403:

>> We also recognize that evidence of similar incidents may be particularly probative on the issue of whether one particular product contained a specific defect. This type of evidence, however, is not particularly probative when, as in this case, it does not even suggest that the defect alleged by the plaintiff exists or that any of the few reported accidents were caused by that defect, and it only shows the possible existence of another similar, but not identical, defect in approximately two percent of Chrysler's automobiles manufactured during 1976-1980.

> 786 F.2d at 1198 (citations omitted). In the case before us, according to Ford, even "[ex]pressed as a percentage of Escort sales alone, this amounts to 2/1000 of one percent of the approximately 3 to 5 million Escorts sold during the 1980s."

[9]Ford freely admitted at trial that its boots could get cut—in fact, it admitted that they could get torn completely off—while the vehicle was being driven, and that contaminants could enter the C.V. joint when this occurred. Moreover, the district court admitted vehicle warranty reports which revealed that Ford had received a number of customer complaints concerning cut boots and contaminated C.V. joints.

absolutely no relevance to any issue in this case."[10]  Therefore, we conclude that the district court did not abuse its discretion in excluding this evidence.

3. Drawings Regarding the Wire Ring Retainer

Johnson contends that the district court erred by rejecting two engineering drawings which predate the manufacture of Darlene's Escort and depict a halfshaft and C.V. joint assembly with a *wire ring retainer*.  Johnson's strongest argument regarding the relevancy of these drawings is that they show that, prior to manufacturing Darlene's Escort, Ford was aware of a feasible alternative design for a ring retainer capable of alleviating the cutting problems.  Nevertheless, (1) Ford stipulated at trial that a feasible alternative design was available, reducing Johnson's contention to a non-issue, and (2) these drawings are of a halfshaft assembly for a 1985 Tempo/Topaz with a manual transmission rather than for a 1983 1/2 Ford Escort with an automatic transmission.  We conclude, therefore, that the district court did not abuse its discretion in finding that the drawings are of questionable probative value in the case at issue.

Johnson also offered engineering drawings to show that Ford's drawings of a wire ring retainer contained the following legend:  "Restrictions to help safeguard health, safety and the environment apply to substances used in the item(s) addressed by the document."  Ford challenged the admissibility of this evidence at trial and, outside the presence of the jury, Mann testified that this legend addressed materials used in the manufacture of the retainer—namely asbestos—and not the function of the part.  Johnson did not offer evidence to controvert this testimony, and he did not again offer the documents into evidence later during trial.  Accordingly, we conclude that Johnson has no basis for raising this issue on appeal.

B. *Ford's Closing Argument*

Johnson also challenges statements made by Ford in its closing argument.  Specifically, Johnson asserts that

> [t]he trial court tied Plaintiff's hands and let Ford land a fatal blow to Plaintiff's case when, after ruling out evidence of other accidents, it allowed defense counsel to argue that if the Plaintiff had been able to find evidence of a single accident resulting from a halfshaft failure

---

[10]Emphasis has been added.

such as the one in question, that we would have presented it. Furthermore, the court refused to instruct the jury that evidence of other accidents had been ruled out of the case.

According to Johnson, Ford violated its own motion in limine to exclude Johnson's evidence of other accidents when it made such statements.

This court has recognized that the district court "is in a far better position than an appellate court to evaluate the prejudice flowing from counsel's improper comments during trial and to determine the most effective response to ensure a fair trial." *Mills v. Beech Aircraft Corp., Inc.,* 886 F.2d 758, 765 (5th Cir.1989). Even if remarks are deemed improper and a trial judge's response is deemed inadequate, a new trial will not be granted unless, after considering counsel's trial tactics as a whole, the evidence presented, and the ultimate verdict, the court concludes that "manifest injustice" would result by allowing the verdict to stand. *Id.*

Ford defends the statements at issue by asserting that they were made in response to statements in Johnson's closing argument referring to warranty reports which allude to C.V. joints binding and sticking; according to Ford, these statements were made to diminish Mann's testimony. Specifically, Ford states that its

> counsel's comments simply responded to Plaintiff's counsel's argument and directed the jury's attention to the fact that, even if they believed Plaintiff's argument that the warranty reports showed that C.V. joints could bind or stick, there was no evidence that this problem ever caused an accident.

Moreover, Ford contends that, even if the statements Johnson challenges were improper, they do not justify a new trial for, "[a]fter 12 days of trial with hundreds of exhibits admitted into evidence, this single statement by counsel in closing surely could not have affected the final verdict."

We conclude that the impropriety of Ford's statements, if any, is offset by the statements by Johnson which prompted them. Moreover, as discussed above (*see supra* Part II.A.1), the evidence of other lawsuits and claims offered by Johnson did not have enough probative value to survive Rule 403 of the Federal Rules of Evidence, and Johnson never offered admissible evidence of an accident like Darlene's resulting from a halfshaft failure caused by the contamination of an inboard C.V. joint. In short, the alleged prejudicial effect of Ford's statements is minimized by the fact that their accuracy is supported by the record, and we conclude that Johnson has not presented us with a case of manifest

injustice.  *See Mills,* 886 F.2d at 765.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.